IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2001

## CLARENCE EUGENE LEWIS v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. 96-000-784     William Baker, Commissioner**

---

**No. M2000-01529-COA-R3-CV - Filed July 18, 2001**

---

A prisoner in the custody of the Department of Correction suffered a severe hand injury while working in a prison industries workshop.  He submitted a claim to the Tennessee Claims Commission, contending that negligence on the part of his supervisors caused his injuries. Following a hearing, the Commissioner dismissed his claim, finding that the prisoner's own negligence was more than 50% of the cause of his injuries. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission
Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, joined.

Clarence Eugene Lewis, Nashville, Tennessee, Pro Se.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Mark A. Hudson, Senior Counsel, for the appellee, State of Tennessee.

### OPINION

### I.
### AN INDUSTRIAL ACCIDENT

Clarence Eugene Lewis worked as a production control clerk in the Turney Center Industrial Prison and Farm.  Mr. Lewis was considered to be a reliable and versatile worker, and aside from his clerical duties, he performed a variety of chores in the shop as assigned, including painting, assembly, and working as a welders helper.

On October 12, 1995, the Turney Center was on lockdown due to an earlier inmate work stoppage, but twelve prisoners, including Mr. Lewis, had been released from lockdown, called back to work, and told that they would be performing other duties in addition to those in their job

descriptions. The warden had posted a memorandum notifying all prisoners that refusal to report to work when ordered would constitute a Class A disciplinary infraction.

A pending work order required the production of almost 4,000 aluminum property tags. The previous day, Mr. Jimmy Bivens, the manager of the metal plant, had asked inmate Reginald Griffin, a welder, to produce the tags on a punch press. Mr. Griffin had noticed that the machine did not have safety guards on it, and he complained to Mr. Bivens about the dangers of operating a machine without safety guards. Mr. Griffin was taken off the machine, and was not asked to punch aluminum tags again.

At 9:00 on the morning of October 12, Mr. Lewis was helping Mr. Griffin do some welding. Mr. Bivens came over to them, and asked Mr. Lewis to operate the punch press. Mr. Lewis had never used the machine before. Mr. Bivens demonstrated its operation to him, and then observed as he operated the press. The job involved hand-feeding strips of aluminum that were one inch wide and four to six feet long into the right side of the machine, to be stamped, punched, and cut into two and three-quarter inch tags. As each tag was produced, the length of the strip being fed was reduced, bringing the operator's hand closer to the machine's point of operation.

Mr. Bivens instructed Mr. Lewis to produce as many tags from each strip of aluminum as possible, and then to use a fresh aluminum strip to free the unusable stub of each used strip from the bed of the press, and to push it off the machine. Mr. Lewis claims that because of the thin gauge of the aluminum (20 mm) the strips bent easily, rendering them difficult to use for their intended purpose.

The machine in question was a Niagara Model AF 3.5 punch press. The operating manual for the press shows that either palm buttons or a foot pedal could be used as possible controls for its operation. The manual cautions that "when Foot Switches are used, Niagara urges adequate guarding of the die area to protect the operator's hands." In this case, the press was operated by a foot pedal that had been purchased separately from the machine. The pedal mechanism was enclosed in a metal housing, requiring the operator to insert his foot into the housing in order to depress the pedal.

It is undisputed that on October 12, 1995, there were no safety guards in place to shield the operator's hands from the point of operation. Mr. Lewis testified that after showing him how to use the machine, Mr. Bivens left the work area. Mr. Lewis sat down at the machine and worked for several hours without supervision. Sometime between 1:00 and 2:00 p.m., he reached into the area of operation with his right hand to remove scrap metal from under the die, and the die came down on his hand, crushing his fingers. He was transported to the hospital for surgery. Half of his fourth finger had to be amputated, and he lost the use of his fifth finger.

In January of 1996, Mr. Lewis filed a "Claim for Damages" in the Division of Claims Administration. That office was unable to act on the claim within ninety days, and transferred the matter to the Tennessee Claims Commission pursuant to Tenn.Code.Ann. § 9-8-402(c). Mr. Lewis then filed a complaint with the Commission, contending that his injury was caused by Mr. Bivens' failure to train him properly on the use of the press and/or to furnish him with a safe piece of equipment to operate.

The claimant subsequently filed a "Motion for Partial Summary Judgment" on the issue of liability. The State's response in opposition to the motion asserted that there were genuine material facts in dispute, created by Mr. Bivens' affidavit that Mr. Lewis was given instruction on how to operate the machine, and by sworn responses to Mr. Lewis' interrogatories which stated that all appropriate safeguards were in place. The State also raised the affirmative defense of comparative negligence. Claims Commissioner W.R. Baker denied the "Motion for Partial Summary Judgment," and subsequently assigned the case to an administrative law judge (ALJ).

On May 25, 1999, a hearing was conducted before the ALJ. Mr. Lewis appeared pro se and as a witness. The other witnesses were all participants in the prison industries workshops at the Turney Center: three supervisors employed by the Department of Correction, and two inmate workers.

While there was no dispute as to the general circumstances of Mr. Lewis' injuries, Mr. Bivens testified that he specifically warned Mr. Lewis never to put his hands into the point of operation of the machine, while Mr. Lewis denied that any such warning had ever been given. There was also a question as to whether the die could come down more than once on a single depression of the foot pedal. Mr. Bivens denied that he had ever seen it happen, but Mr. Lewis testified that he had learned that the machine had a history of recycling unexpectedly. The defense also claimed that barrier guards could not be used on the machine for this particular job, and that the guarded foot pedal and "distance" constituted adequate safeguards.

At the conclusion of the proof, and after closing arguments, the judge took the case under advisement. On July 2, 1999, he issued an order which dismissed Mr. Lewis' claim. The judge's ruling included both findings of fact and conclusions of law, which we quote in part as follows:

**FINDINGS OF FACT**

. . . .

13. After the supervisor left, the Claimant brought a chair over to the machine so he could work sitting down. He became complacent with the operation and began using his hand to clear scraps and jammed strips from under the press. On the occasion at issue, the Claimant, with his foot inside the safety shield, leaned

forward from his sitting position to clear the press area with his hand. As he leaned forward, his foot depressed the pedal and the press came down on two fingers of his right hand.

14. The Claimant was taken to Nashville Memorial Hospital where he underwent surgery on his hand. Half of his fourth finger was removed and his small finger is now stiff and cannot be used.

## CONCLUSIONS OF LAW

. . . .

2. It is the Claimant's burden to prove by a preponderance of the evidence that his injuries are the result of the State's negligence, and it is DETERMINED that he has not carried the burden of proof.

3. The Claimant received adequate instructions for safe operation of the press. The accident happened because he disregarded the instructions and operated the press in an unsafe manner. He put himself in danger by operating the press from a sitting position, and he intentionally put his hand underneath the press while his foot was on the trip pedal.

4. Even if the Claimant had proven that his supervisors were negligent to some degree, the Claimant was at least 50% responsible, and under the principles of comparative fault in Tennessee, is not eligible to recover any compensation for damages.  McIntyre v. Balentine, 833 SW2d 52 (Tenn. 1992).

5. Therefore it is ORDERED that the claim in this matter be, and is hereby, DENIED and the matter DISMISSED.

This appeal followed.

### III.
#### DUTY, BREACH AND FORESEEABILITY

Tenn.Code.Ann. § 9-8-307 defines the jurisdiction of the Claims Commission:

(a)(1) The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," as defined in § 8-42-101(3), falling within one (1) or more of the following categories:

. . .

-4-

(C)   Negligently created or maintained dangerous conditions on state controlled real property.  The claimant under this subsection must establish the foreseeability of the risks and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures;

. . .

(E) Negligent care, custody and control of persons.

The statute further goes on to state that "[t]he determination of the state's liability in tort shall be based on the traditional tort concepts of duty and the reasonably prudent person's standard of care." Tenn.Code.Ann. § 8-9-307(c).

The necessary elements for a negligence claim are well known, though they are sometimes stated in slightly different ways.  Both parties refer us to the case of *Kilpatrick v. Bryant*, 868 S.W.2d 594 (Tenn. 1993) as the source for the following formulation: "A claim for negligence requires proof of the following elements (1) a duty owed to the plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) injury or loss; (4) cause in fact; and (5) proximate cause."  In the case of claims under Tenn. Code. Ann. § 8-9-307(a)(1)(C), the elements of notice and foreseeability must be added to the above list.

There can be no doubt that the supervisors at the Turney Center owed a duty to Mr. Lewis and to the other inmates under their supervision to maintain safe conditions in the workshops, and to make reasonable efforts to protect them from harm.  *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995) for an extended discussion of duty in the context of a negligence action. The ALJ did not dispute that Mr. Bivens and the other supervisors were subject to such a duty, but his order strongly implies that there was no breach of that duty, because "[t]he Claimant received adequate instructions for safe operation of the press."

The record contains numerous documents which indicate a sustained effort to maintain safety at prison workshops.  For example, the Procedures Manual for Correctional Enterprises of Tennessee requires each inmate to read the instructions for the operation and safety of each machine he is expected to work on, and to sign a witnessed Machine Safety Statement in which he acknowledges having done so, and that he agrees that

"I will not operate any machine without the proper safety guards/precautions and will only operate those machines for which I have received instructions."

A memorandum dated January 20, 1995 and issued by Mr. Bivens in his capacity of Acting Plant Manager orders each supervisor to set aside one day each month to hold a safety meeting with his assigned inmate workers.  A related memo addressed to Metal Plant workers lists all the workers required to attend the safety meeting for that department.  Mr. Lewis is not on that list.

The Tennessee Department of Labor also participates in the effort to keep prison workshops safe. A letter in the record dated October 19, 1993 from that Department's Division of Occupational Safety and Health reports the result of a safety inspection of five presses, five press brakes and two shears being used in the metal plant at the Turney Center. The letter does not identify the individual machines by make or serial number, but notes that "one hydraulic power-press is not being effectively safeguarded," while the other four mechanical power presses are deemed to be safe because their points of operation are protected by fixed barrier guards.

It appears to us that contrary to the conclusions of the ALJ, the instructions that Mr. Bevins allegedly gave to Mr. Lewis failed in several respects to discharge his duty of due care. These failures included (1) the assignment of an untrained inmate to a machine for which he had not been certified, (2) the lack of any guarding devices on the point of operation, (3) failure to provide a tool adequate to the task of removing waste from the bed of the machine without danger to the operator, and (4) lack of any supervision after Mr. Lewis began operating the machine.

The appellee notes Mr. Griffin's testimony that when he operated the machine the previous day and had to remove scrap by hand, he turned the machine off before doing so, and suggests that Mr. Lewis should have followed this "common-sense" approach. We observe, however, that there was no testimony that Mr. Bivens or anyone else had instructed Mr. Lewis in this method, or even that Mr. Lewis knew how to safely turn the machine on or off. There is ample evidence in the record to indicate that the elements of duty, breach, notice and foreseeability have all been satisfied.

**IV.**
**CAUSATION AND COMPARATIVE FAULT**

There can be no doubt that the negligence of Mr. Bivens contributed to the accident that resulted in injury to Mr. Lewis, and thus must be considered a cause in fact of that accident. As for whether it may be considered a proximate, or legal cause, we note that in order for negligent conduct to constitute a legal cause of harm, it must be "a substantial factor in bringing about the harm being complained of." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).

In *Quaker Oats Co. v. Davis*, 232 S.W.2d 282, 289 (Tenn. Ct. App. 1949), this court discussed that requirement:

> "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense', which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called 'philosophic sense', yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes."

-6-

It appears to us that inadequate training, and failure to maintain a safe workplace contributed to the injury suffered by Mr. Lewis. These were substantial causes of his injury, and not merely causes in the "philosophic sense."

We also agree with the trial judge that Mr. Lewis was at least partially at fault for his own injury, for the action of putting his hands in a place of danger was the most immediate and direct cause of the accident. Since both parties contributed to the injury, the question before us brings us into the realm of comparative fault.

## IV.
### COMPARATIVE FAULT

Prior to the establishment of a system of comparative fault in Tennessee, the doctrine of contributory negligence held sway. Under that doctrine, an injured plaintiff was precluded from collecting from a tortfeasor, if the tortfeasor could prove that the plaintiff's own actions had contributed to his injuries.

The system of comparative fault adopted by our Supreme Court in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992) replaced that harsh doctrine with one that improves the possibility for recovery by plaintiffs. Comparative fault allows the courts to compare the fault of the tortfeasor or tortfeasors to the fault of the plaintiff. If the plaintiff's own negligence is less, he may recover, but the damages he can collect are reduced in proportion to the percentage of the total negligence that can be attributed to him. Conversely, if the fault of the plaintiff is equal to or greater than the fault of the defendant or defendants, the plaintiff may not recover.

Our Supreme Court set forth a general set of guidelines in *Eaton v. McLain*, 891 S.W.2d 587 (Tenn. 1994) to assist finders of facts when apportioning fault:

> "In summary, the percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth."

891 S.W.2d at 592.

The court did not claim that the above list was exhaustive, but it does create a useful point of departure for analysis of fault. Thus, the immediacy of the causal connection between the action

of Mr. Lewis and his injury weighs heavily against him, but it is just one of several factors for the Commission to take into account.

We note that the second factor weighs against both parties, for both were aware of the potential danger, but neither can be said to have confronted it in a reasonable manner. The third factor weighs most heavily against the defendant; Mr. Bivens had many opportunities to minimize or eliminate the risk, but chose not to do so. The fourth and fifth factors do not appear to be relevant to this inquiry, but the sixth weighs strongly against the defendant, for his training, experience and authority placed him in a far better position both to appreciate the danger and to take steps to avoid it.

The ALJ found as a fact that Mr. Lewis became complacent and while using his hand to clear the machine, with his foot inside the pedal housing, he depressed the pedal and cause the press to descend and crush two fingers on his right hand. These findings of fact are presumed to be correct, *see* Rule 13(d), Tenn. R. App. P., and we cannot find that the evidence preponderates against them. Based on those facts the ALJ concluded that Mr. Lewis was at least 50% at fault in causing his injury.

Proximate causation is a mixed question of law and fact. *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276 (Tenn. Ct. App. 1977). It is to be decided "upon mixed considerations of logic, common sense, justice, policy and precedent." *Mullins v. Seaboard Coastline Railway Co.*, 517 S.W.2d 198 (Tenn. Ct. Ap. 1974). But, procedurally, the issue is one for the trier of fact. *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d at 281. "The asserted level of fault of a party is a circumstance for the finder of fact to consider when determining the percentage of fault of each party in producing the injury. *Prince v. St. Thomas Hospital*, 945 S.W.2d 731 at 736 (Tenn. Ct. App. 1996). Therefore, the apportionment of fault by the trier of fact is also entitled to the presumption of correctness, and in this case we cannot find that the evidence preponderates against the ALJ's fault allocation.

**IV.**

The order of the trial court is affirmed. Remand this cause to the Claims Commission for any further proceedings necessary. Tax the costs on appeal to the appellant, Clarence Eugene Lewis.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.