IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2016 Session

# DONALD CROCKETT, ET AL. v. SUMNER COUNTY BOARD OF EDUCATION, ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 83CC12013CV325   Joe Thompson, Judge**

_____

**No. M2015-02227-COA-R3-CV – Filed November 30, 2016**

_____

A thirteen year-old child slipped off bleacher seats at a middle school and injured his leg when he was using the seats as steps in July 2012. The child and his parents sued the school for negligence, and the school asserted the defense of comparative negligence. The trial court applied the Rule of Sevens, concluded the school rebutted the presumption of no capacity for negligence, and determined that the child was solely responsible for his injury. The trial court also determined that the school was not liable for negligent supervision of the child. The parents and child appeal, and we affirm the trial court's judgment.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Donald Capparella and Sean Martin, Nashville, Tennessee, for the appellants, Donald and Melissa Crockett.

Leah May Dennen, Gallatin, Tennessee, and A. Scott Derrick, Thomas B. Russell, and Sarah L. Blood, Nashville, Tennessee, for the appellee, Sumner County Board of Education.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

Andrew Crockett was thirteen years old in July 2012 when he was attending summer school at T.W. Hunter Middle School. On the final day of summer school, Andrew slipped off of a bleacher seat on which he was walking and fractured his lower leg above the ankle. Andrew was transported by ambulance to a hospital where he underwent surgery. His parents, Melissa and Donald Crockett, filed a complaint on behalf of themselves and Andrew against the Sumner County Board of Education d/b/a T.W. Hunter Middle School ("T.W. Hunter" or "the School") and William Lowe, who was one of Andrew's summer school teachers. The Crocketts asserted claims for negligence, negligent infliction of emotional distress, negligence per se, premises liability, and vicarious liability. They subsequently dismissed Mr. Lowe as a named defendant, and the case continued against T.W. Hunter. In its answer, the School asserted that Andrew's injuries were a result of his own negligence. In the alternative, the School contended that Andrew was more than fifty percent at fault for his accident, and that under the doctrine of comparative fault, the Crocketts were barred from recovering any damages from T.W. Hunter.

The parties engaged in discovery, and when discovery was completed, both the Crocketts and T.W. Hunter filed motions for summary judgment. The trial court granted the School's motion on the issue of premises liability and dismissed that claim, but it denied both motions with respect to negligence. The parties tried the remaining claims before the court, without a jury, on September 28, 2015.

At trial, Andrew testified that he had to attend summer school in the summer of 2012 because he had failed the eighth grade. He did not testify that he was unable to do the work assigned to him; rather, he explained that he chose to spend time with his friends instead:

> It was my last year of middle school. I had - - I was excited about going to high school, so I kind of was - - just fell off on my grades and kind of traded off hanging out with friends and stuff like that.

Andrew then testified about the events leading up to his accident. He explained that on the second to last day of summer school, someone stuck a roll of toilet paper down a toilet in the boys' bathroom located in the gymnasium, causing the toilet to overflow and creating a mess in the bathroom. Coach William Lowe and Coach Clinton Niehaus were two of Andrew's summer school teachers, and they asked the boys to tell them who was responsible for the vandalism. When no one was willing to confess or identify the perpetrator(s), Coaches Lowe and Niehaus decided on a collective punishment and told

the boys they would all be required to clean up the mess the following day, June 28, 2012, before they would be excused for the remainder of the summer.

Andrew testified that after he and his classmates finished their final exams on the last day of summer school, the boys reported to the gym, where Coach Niehaus was waiting for them. According to Andrew, Coach Niehaus told the boys that everyone was required both to mop the bathroom and pick up trash in the bleachers. Andrew offered to mop first, and after he finished mopping, Andrew joined the boys in the bleachers to help pick up trash.

Andrew testified that he was wearing sneakers that day and that they were wet when he finished mopping. Andrew did not know whether Coach Niehaus realized Andrew's shoes were wet when he directed Andrew to start cleaning up the trash in the bleachers. Andrew testified that the other boys were using the blue bleacher seats as steps while they collected the trash, and Andrew did the same:

> Q: [H]ow were you going about picking up - - traveling to pick up that trash?
> A: I was just standing on the blue part, and I would step down to get the trash, and so on and so forth.
> Q: Okay. Is that what the kids were doing before you came - - or when you had first arrived at the gym?
> A: Yes, sir.
> Q: They were walking on the blue part?
> A: Yes, sir.
> Q: Okay. And Coach Niehaus was there?
> A: Yes, sir.
> Q: Did you hear Coach Niehaus tell any of those kids not to walk on the blue part?
> A: No, sir.
> Q: At what point - - Well, did Coach Niehaus supervise you as you were cleaning the bleachers?
> A: Yes, sir. . . . He was standing in the same location as before, with his arms crossed, facing the bleachers, watching us pick up trash.
> Q: He saw you step on the blue part of the bleacher?
> A: Yes, sir.

Andrew then explained that Coach Niehaus left the gym for a few minutes, and that is when he fell. Andrew explained how he fell:

> I was walking down the bleachers. I went to take a step, and I slipped, and I guess I came down on my leg. And I knew I fell and it hurt. Because there were kids around me, I didn't want to look like a - - cry or look weak

or anything, because it didn't really hurt at first until I looked at it. And when I looked at it, I saw my bone sticking out and I really didn't see my foot. And once I saw it, all the pain hit and I had started screaming.

When Andrew was asked whether he usually used the blue bleacher seats as steps, he responded, "Yes, sir. It was an everyday thing." Andrew explained, "I thought nothing of it. It's just a way of getting up and down the bleachers."

On cross examination, Andrew admitted that he knew from the time he was "a little kid" that he was not supposed to use the bleacher seats as steps. He said that when he started playing baseball, when he was "probably five years old . . . [m]y mom told me, don't walk on the seat part." Andrew testified he just "wasn't thinking about it" when he fell in the summer of 2012.

Coaches Lowe and Niehaus also testified at the trial. Coach Lowe described Andrew as a "[v]ery polite young man, quiet. . . . Overall kind of a good kid." Coach Lowe testified that he went into the boys' bathroom the day after the toilet overflowed, before the boys were directed to mop and clean up the bleachers. By that time, according to Coach Lowe, the floor was "95 percent dry." He explained that there was "a little glaze," but the pieces of paper that were scattered around the floor "had all dried up" overnight.

Coach Lowe testified that he told the students "daily" not to use the blue seats as steps to go up and down the bleachers. He said, though, that the students used the seats as steps anyway: "You tell them to do things, you instruct them to do things, but they do things that they want to do sometimes." Coach Lowe testified that the students walked on the bleacher seats regardless of whether they were being supervised or not.

Coach Niehaus was the teacher supervising the boys in the gymnasium on the day Andrew injured himself. Contrary to Andrew's testimony, Coach Niehaus testified that the boys who mopped the bathroom were not also required to clean the bleachers. As he explained,

> It wasn't necessarily a choice. But the options were, you know, some of you are going to mop, some of you are going to clean the bleachers, and [Andrew] volunteered to mop; therefore, he would not have been expected to clean the bleachers.

Coach Niehaus described Andrew as "an average student, kept to himself, well-behaved boy," without any discipline issues. Like Coach Lowe, Coach Niehaus testified that he also warned the students not to use the bleacher seats as steps:

> We would make statements such as, use the walkway, you know, try not to use the plastic part, use the walkway; go take the steps where it's got the sandpaper.

According to Coach Niehaus, the students walked on the seats as a short cut, but they knew they were supposed to go up and down the bleachers using the stairs, not the seats.

Coach Niehaus testified that he was in the gymnasium when Andrew slipped and hurt his leg. He had gone down the hall to find another mop and was gone for just two or three minutes. He had just returned to the gymnasium when he heard the commotion surrounding Andrew's fall. Coach Niehaus did not see Andrew slip, but he heard "crashes" and "yelling" and immediately went over to where Andrew was lying to assess the situation and calm him down.

Once all the evidence was in, T.W. Hunter moved for an involuntary dismissal of the Crocketts' complaint, which the trial court denied. The court then issued a memorandum opinion in which it concluded that Andrew was negligent in falling and that his negligence "was the sole cause of his fall on June 28, 2012." The trial court made the following findings of fact:

1. In June, 2012, Andrew Crockett ("Andrew") attended summer school at T.W. Hunter Middle School.

2. In June, 2012, Coach William Lowe ("Coach Lowe") and Coach Clint Niehaus ("Coach Niehaus") were teaching summer school at T.W. Hunter Middle School. Andrew was one of their students.

3. At the time of the accident which forms the basis for this claim, Andrew was thirteen (13) years old and getting ready to enter high school.

4. On June 27, 2012, one of the 7th or 8th grade boys flooded the boys' bathroom located in the gym by placing toilet paper in the toilet to cause an overflow.

5. At the end of the school day on June 27, 2012, Coaches Lowe and Niehaus sat the 7th and 8th grade boys down and asked them to tell the Coaches which student flooded the bathroom. None of the students responded with a name.

6. The following day, June 28, 2012, was the last day of summer school.

7. The students were scheduled to be released around 11:00 or 11:30 a.m. on June 28, 2012.

8. The students next took their final tests and were given another chance to confess. Again no student confessed.

9. The Coaches gave the students a choice: they could stay and clean the bathroom and leave at noon, or they could stay a full day and be released at 3:00. The students chose to stay and clean.

10. On June 28, 2012, the previously flooded bathroom was almost dry, although it may have had some damp spots here and there.

11. The students were broken up into two groups: the 8th grade boys went to a classroom with Coach Lowe while Coach Niehaus stayed in the gym with the 7th grade boys who picked up trash from the bleachers located in the gym. The 7th grade boys also picked up dry toilet paper from the bathroom floor.

12. Once the 7th grade boys were finished, they went to the classroom with Coach Lowe, and the 8th grade boys came to the gym with Coach Niehaus.

13. Coach Niehaus split the boys into two groups: one group would clean and mop the bathroom while the other group would pick up trash in the bleachers.

14. Andrew volunteered to mop the bathroom.

15. There is no evidence in the record of how Andrew mopped the bathroom or that he mopped the bathroom in an incorrect manner.

16. After Andrew volunteered to mop the bathroom, Coach Niehaus left the gym to get a dry mop.

17. After mopping, Andrew decided to clean the bleachers on his own. Neither Coach Niehaus nor Coach Lowe told Andrew to clean the bleachers.

18. The bleachers located in the gym have several stairways that lead to the top. Each of the steps is covered in a non-slip material. The bleacher seats are made of plastic and run between the stairways.

19. During summer school, both Coaches Niehaus and Lowe informed the boys in the proper use of the bleachers, which is to use the stairways to go up and down the bleachers and not to use the bleacher seats as steps.

20. Andrew had known, since he was little, that he was not to use the bleacher seats as steps.

21. Andrew testified that the reason he was told not to use the bleacher seats as steps was because it could result in injury.

22. Despite this knowledge, Andrew decided to walk down the bleacher seats as steps.

23. While using the bleacher seats as steps, Andrew fell and was injured. Andrew was aware that this could happen, as he testified walking on the bleacher seats as steps could result in an injury.

24. There is no credible evidence in the record that Andrew's shoes were wet after he completed the mopping assignment and left the bathroom area. His shoes did not leave prints on the gym floor, and Andrew testified that at the time of his fall, he did not even think about whether moisture on the bottom of his shoes had an impact on his fall.

25. Coach Niehaus had already returned to the gym when Andrew fell on the bleacher seats, but was not in a position to see the bleacher area.

26. Andrew testified that if he had used the bleachers as he was told, which was to walk up and down them using the stairway, he would not have fallen and would not have been injured.

27. It is impossible for any teacher, including Coaches Niehaus and Lowe, to constantly supervise all students at all times.

Based on its findings of fact, the trial court concluded:

[A]s Andrew was warned about not using the bleacher seats as steps, and as he knew that such an action could cause injury, the Defendant has rebutted the presumption that Andrew could not be negligent. Andrew's negligence was the sole cause of his fall on June 28, 2012.

The Crocketts appeal, arguing that the evidence preponderates against the trial court's finding that: (1) Andrew was 100% at fault for his injuries; and (2) T.W. Hunter did not breach its duty of supervision to Andrew.

## II. ANALYSIS

### A.  Standard of Review

We review a trial court's findings of fact de novo based on the record, applying a presumption of correctness unless the evidence preponderates otherwise.  TENN. R. APP. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  If the trial court has not made a specific finding of fact on a particular issue, we will review the record to determine where the preponderance of the evidence lies.  *In re Valentine*, 79 S.W.3d at 546; *Durham v. Noble*, No. M2011-01579-COA-R3-CV, 2012 WL 3041296, at *2 (Tenn. Ct. App. July 25, 2012); *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 220 (Tenn. Ct. App. 2009).  The apportionment of fault constitutes a question of fact that we review applying a presumption of correctness.  *Durham*, 2012 WL 3041296, at *3.

### B.  Comparative Negligence

To establish a claim for negligence, the Crocketts must prove T.W. Hunter owed Andrew a duty of care, that it engaged in conduct below the applicable standard of care in the circumstances, that Andrew suffered an injury, and that there was "cause in fact" as well as "proximate cause."[1]  *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013); *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005); *Lewis v. State*, 73 S.W.3d 88, 92 (Tenn. Ct. App. 2001).  "Comparative negligence" involves a comparison of a plaintiff's and a defendant's negligence.  *Lanier v. Bane*, No. M2000-03199-COA-R3-CV, 2004 WL 1268956, at *4 (Tenn. Ct. App. June 8, 2004) (citing *Owens v. Truckstops of Am.*, 915 S.W.2d 420, 425-26 n.7 (Tenn. 1996), and *McIntyre v. Balentine*, 833 S.W.2d 52, 56 (Tenn. 1992)).  If a plaintiff's negligence is equal to or greater than a defendant's, the plaintiff is precluded from recovering any damages from the defendant.  *Lewis*, 73 S.W.3d at 94.

When a plaintiff in a negligence action is a minor child and the defendant raises the affirmative defense of comparative negligence, as here, courts apply a doctrine called "The Rule of Sevens" to determine whether the child's negligence, if any exists, should reduce the child's damages.  *Durham*, 2012 WL 3041296, at *3.  The Rule of Sevens is essentially a rule of capacity and provides that a child under the age of seven has no capacity for negligence; that there is a rebuttable presumption of no capacity for a child between the ages of seven and fourteen; and that there is a rebuttable presumption in favor of capacity for a child between the ages of fourteen and the age of majority.

---

[1]"Cause in fact" asks whether the harm would have occurred if not for the defendant's conduct, and "proximate cause" asks whether the defendant should be held liable for the plaintiff's injury once cause in fact has been established, and includes issues of foreseeability.  *King*, 419 S.W.3d at 246-47; *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993).

*Cardwell v. Bechtol*, 724 S.W.2d 739, 745 (Tenn. 1987); *Durham*, 2012 WL 3041296, at *3. The Rule of Sevens is sometimes referred to as the mature minor exception, *Cardwell*, 724 S.W.2d at 748-49, or the mature minor rule, *Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9-CV, 2001 WL 327906, at *6 (Tenn. Ct. App. Apr. 5, 2001). The *Cardwell* Court described the Rule of Sevens as follows:

> "The rule with respect to a minor's capacity for negligence is that the question is to be judged in the light of his age, ability, intelligence, training and experience and the complexity of the danger with which he is confronted."

*Cardwell*, 724 S.W.2d at 748 (quoting *Bailey v. Williams*, 346 S.W.2d 285, 287 (Tenn. Ct. App. 1960)).

The Rule of Sevens was formally recognized by our Supreme Court in a case where the issue was whether a minor child could give informed consent to a medical procedure. *Cardwell*, 724 S.W.2d at 748-49. It has been applied to determine whether a minor can consent to sexual contact, *Doe*, 2001 WL 327906, at *4-5, whether a minor can be held liable for the commission of a crime, *Juvenile Court of Shelby County v. State ex rel. Humphrey*, 201 S.W. 771, 773 (Tenn. 1918), and whether a minor can be liable for damages resulting from negligence, *Puryear v. Stuart*, No. 70, 1990 WL 38348, at *1 (Tenn. Ct. App. Apr. 6, 1990). The Court of Appeals has applied the rule to a case in which the issue was whether an eleven year-old boy had the capacity for negligence, and it described the rule as follows:

> "Whether a minor has the capacity to [be negligent] depends on the age, ability, experience, education, training, and degree of maturity or judgment obtained by the minor, as well as upon the conduct and demeanor of the minor at the time of the incident involved. Moreover, the totality of the circumstances, the [minor's conduct at issue] and its risks or probable consequences, and the minor's ability to appreciate the risks and consequences are to be considered. Guided by the presumptions in the Rule of Sevens, these are questions of fact for the jury to decide."

*Durham*, 2012 WL 3041296, at *3 (quoting *Cardwell*, 724 S.W.2d at 748).

The plaintiff in *Durham* was riding a bicycle, crossed a street without looking, and got hit by a bus. *Id.* at *1. The boy's parents sued the City of Murfreesboro and the driver of the bus, and the defendants asserted the affirmative defense of comparative negligence. *Id.* After reviewing the evidence presented at trial, the *Durham* court wrote:

> The evidence recounted above shows that Ulysses was knowledgeable in the operation of a bicycle, was familiar with the rules of the road, that he

should stop at stop signs, and that he knew to look both ways before crossing the street. The evidence also shows that he was familiar with the neighborhood, that he had a level of understanding commensurate with his age to understand the dangers associated with riding a bicycle, and that he had been cautioned immediately before the accident to stop at the stop sign.

*Id.* at \*4. The *Durham* court concluded that the evidence rebutted the presumption that the boy was not capable of negligence at the time of the accident. *Id.*

In this case, Andrew was thirteen when he fell off the bleachers, which is less than one year from the time the presumption in the Rule of Sevens changes from having no capacity for negligence to having the capacity for negligence. Both coaches testified that they warned the students often not to use the bleacher seats as steps. Andrew testified that he had known since he was five years old that he was not supposed to use the bleacher seats as steps and that the reason for this is the potential for falling and hurting himself.

Mr. and Mrs. Crockett contend Andrew was immature for his age and lacked the capacity of an average thirteen year-old. However, Coach Niehaus testified that Andrew was an average student and was "well-behaved," and Coach Lowe testified that Andrew was a "good kid" who did not cause any trouble. According to Andrew's father, the principal of Andrew's middle school thought Andrew should attend summer school rather than be held back because Andrew was "a smart kid." Evidence was also introduced that Andrew's parents permitted him to use a BB gun by the time he was thirteen years old. Andrew testified that he failed the eighth grade because he chose to spend time with his friends rather than focus on his school work, not because he was unable to understand the material.

Andrew testified that he often used the bleacher seats as steps despite knowing he was not supposed to do this, and the coaches both testified that the students often used the seats as steps even though they were told they should use the stairs to go up and down the bleachers. No evidence was introduced that Andrew was less capable than other students his age of understanding the dangers of using the bleacher seats as steps.

The Crocketts complain the trial court failed to find Andrew had the "capacity" to appreciate the danger of using the bleacher seats as steps. We determine, based on our review of the record, that Andrew understood the risks and probable consequences of using the seats as steps and that he had the capacity to be negligent when he fell while using the seats as steps. Therefore, we affirm the trial court's determination that the school rebutted the presumption that Andrew did not have the capacity to be negligent based on his age.

The trial court ruled that Andrew was the sole cause of his fall, and, thus, was

100% negligent. For T.W. Hunter to prevail on its defense of comparative negligence, it only needed to prove Andrew was more than fifty percent negligent. *See Lewis*, 73 S.W.3d at 94 (noting that plaintiff may not recover any damages from defendant if plaintiff's negligence is equal to or greater than that of defendant). We agree with the trial court that the preponderance of the evidence establishes that Andrew's negligence was more than fifty percent and that pursuant to the doctrine of comparative negligence, Andrew is precluded from recovering any damages from T.W. Hunter.

### C. Negligent Supervision

Teachers have a duty to supervise their students to protect them from harm, but this does not mean that a teacher has breached this duty whenever a student gets injured while at school. *Cadorette v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9510-CV-00441, 1996 WL 187586, at *2 (Tenn. Ct. App. Apr. 19, 1996). Teachers and other school officials are required to exercise the standard of care that is "reasonable and ordinary care under the circumstances." *Nickelson v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9807-CV-00375, 1999 WL 767813, at *3 (Tenn. Ct. App. Sept. 29, 1999) (citing *Hawkins Cnty. v. Davis*, 391 S.W.2d 658, 660 (Tenn. 1965)); *see also Snider v. Snider*, 855 S.W.2d 588, 590 (Tenn. Ct. App. 1993). However, "teachers and local school districts are not expected to be insurers of the safety of students while they are at school." *Nickelson*, 1999 WL 767813, at *2; *see also Cadorette*, 1996 WL 187586, at *2; *King v. Kartanson*, 720 S.W.2d 65, 68 (Tenn. Ct. App. 1986). A teacher's "duty of reasonable care must be considered in relation to all the relevant circumstances, and the degree of foreseeability needed to establish a duty of care decreases in proportion to increases in the magnitude of the foreseeable harm." *Nickelson*, 1999 WL 767813, at *2. The amount of supervision a teacher is required to exercise is based on the age and experience of the students, their maturity level, and the dangers of a particular situation. *King*, 720 S.W.2d at 68.

Coach Niehaus was supervising the students while they were picking up trash in the bleachers. He testified that he was gone for just a few minutes to find another mop before Andrew fell, and that he was in the gymnasium at the time Andrew fell. The evidence was disputed regarding whether Andrew was required to clean up the trash from the bleachers after mopping the bathroom or whether he elected to join his classmates in the bleachers. The evidence was also disputed regarding whether Andrew's shoes were wet enough to leave marks on the floor after mopping the bathroom such that he would be more likely to slip in the bleachers. The trial court found that Andrew decided on his own to clean the bleachers without being required to do so by either Coach Lowe or Coach Niehaus. The court also found "no credible evidence" that Andrew's shoes were wet after he finished mopping. A trial court judge is in a better position than we are to determine witness credibility because he or she is able to observe the witnesses and evaluate their demeanor. *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 820 (Tenn. Ct. App. 2009). Therefore, we will not disturb a trial court's findings of fact based on witnesses' credibility unless clear and convincing evidence convinces us

otherwise. *Id.*; *Forrest Constr.*, 337 S.W.3d at 220. There is no clear and convincing evidence to the contrary here.

A teacher cannot supervise all of his or her students every minute of the day. *See Nickelson*, 1999 WL 767813, at *4. "[T]aken to its logical conclusion, [a duty to observe his or her students continuously] would preclude a teacher from performing any task which required his or her attention elsewhere." *Id.* Coach Lowe was asked why he was not able to supervise the students "constantly," and he replied:

> You can't be everywhere at once, which is impossible. You know, if I wanted to move these eighth graders around everywhere we went like a gaggle of geese, you know, if we went to the restroom, we all go together, but I still can only supervise half of them because I'm not going into the girls' bathroom. So there is going to be times when students just aren't supervised 100 percent of the time. If my back was turned to a student while I'm helping a student behind me, I may be in his midst, but I'm not seeing what he's doing.

The Crocketts contend Andrew would not have hurt himself in the bleachers if he had not been required to pick trash up from the bleachers after mopping the bathroom. The trial court found, however, that the evidence did not show Andrew's shoes were wet after he finished mopping or that he was required to clean the bleachers. As discussed above, we defer to the trial court's findings on these issues because the testimony was disputed and the trial court was in the best position to determine the witnesses' credibility. Based on these findings of fact, the Crocketts are unable establish cause in fact or proximate cause. *See King*, 419 S.W.3d at 246-47 (providing thorough discussion of cause in fact and proximate cause).

For all of these reasons, we find the preponderance of the evidence supports the trial court's judgment that T.W. Hunter is not liable for negligently supervising Andrew when he fell and hurt his leg.

### III. CONCLUSION

The trial court's judgment is affirmed. Costs of this appeal shall be taxed against the appellants, Donald and Melissa Crockett, for which execution shall issue, if necessary.

_____
ANDY D. BENNETT, JUDGE